1
2
3
4
5
6
7

8            **UNITED STATES DISTRICT COURT**

9            **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   UNITED STATES OF AMERICA,                    CASE NO. 09cr2856-IEG

12                              Plaintiff,
                                                  Order Denying Defendant's
13          vs.                                   Motion to Suppress

14   ROBERT JOHN McGILL,

15                              Defendant.

16

17          Defendant moves the Court for an order suppressing evidence which Carnival staff

18   collected on board the *Elation*, including any statements he made to Carnival staff after they took

19   him into custody. Defendant argues Carnival staff acted jointly with the government, at the

20   government's behest, and for the government's benefit, in an area traditionally reserved for law

21   enforcement.  Defendant concedes that under the circumstances, Carnival staff could detain him,

22   enter his cabin to determine Mrs. McGill's well-being, and gather evidence which was in plain

23   sight.  However, defendant argues Carnival staff needed to obtain a warrant before they searched

24   his cabin or backpack. Defendant also argues the law required Carnival staff to advise him of his

25   <u>Miranda</u> rights before questioning him.

26          The parties initially briefed the suppression issue and presented oral arguments during a

27   hearing on September 28, 2009.  The Court then held an evidentiary hearing on January 26, 2010,

28   regarding the extent of the government's direction and participation in Carnival's investigation of

1    Mrs. McGill's death on board the *Elation*.  The parties submitted further briefing after the

2    evidentiary hearing, and the Court heard further oral argument regarding the government actor

3    issue on February 19, 2010.  Having considered all of the parties' arguments, for the reasons

4    explained below, the Court DENIES defendant's motion to suppress.

5                                    ***Legal Standard***

6            The Fourth Amendment generally does not protect against unreasonable intrusions by

7    private individuals.  United States v. Reed, 15 F.3d 928, 931 (9th Cir. 1994) (citing Walter v.

8    United States, 447 U.S. 649 (1980)).  The Fourth Amendment does, however, prohibit private

9    individuals, who are acting as instruments or agents of the government, from unreasonably

10   intruding upon another person's privacy rights.  Id. (citing Coolidge v. New Hampshire, 403 U.S.

11   443, 487 (1971)).

12           "The government must be involved either directly as a participant or indirectly as an

13   encourager of the private citizen's actions before [courts] will deem the citizen to be an instrument

14   of the state."  United States v. Walther, 652 F.2d 788, 792 (9th Cir. 1981). In order to determine

15   whether a private individual is acting as a governmental instrument or agent for Fourth

16   Amendment purposes, the Ninth Circuit has articulated the following two-part inquiry:

17           (1) whether the government knew of and acquiesced in the intrusive conduct; and

18           (2) whether the party performing the search intended to assist law enforcement efforts or
             further his own ends.

19
20   Reed, 15 F. 3d at 931; see also United States v. Attson, 900 F.2d 1427, 1432 (9th Cir. 1990)

21   (applying standard to determine whether Fourth Amendment was implicated by non-law

22   enforcement governmental party's conduct); Walther, 652 F.2d at 792 (analysis of whether private

23   individual was acting as "instrument or agent" of the government requires inquiry regarding

24   "(1) the government's knowledge and acquiescence, and (2) the intent of the party performing the

25   search.")[1].  The burden is upon the defendant to demonstrate the government's involvement was

26   _____

27           [1]Defendant argues the Court should also apply the public function and joint action tests, set
     forth in Lee v. Katz, 276 F.3d 550, 554-55 (9th Cir. 2002) and Flagg Bros., Inc. v. Brooks, 436
     U.S. 149, 164 (1978), respectively.  The Ninth Circuit, however, has never relied upon these
28   alternative tests to determine whether a search and seizure was conducted in violation of the
     Fourth Amendment, or whether a statement should be suppressed for failure to provide Miranda
     warnings. The Court will, however, consider defendant's evidence of purported "joint action"

1    sufficient to subject Carnival employees' actions to constitutional scrutiny. United States v.

2    Gumerlock, 590 F.2d 794, 799 (9th Cir. 1979).

3         The Ninth Circuit has applied a similar standard to determine whether a private person was

4    acting as an arm of the government when he elicited self-incriminating statements from an

5    individual in custody.  The critical question is "whether the person with whom the defendant

6    speaks is involved 'on behalf of the state'." United States v. Roston, 986 F.2d 1287, 1292 (9th Cir.

7    1993) (quoting Jones v. Cardwell, 686 F.2d 754, 756 (9th Cir. 1982)); see also United States v.

8    Pace, 833 F.2d 1307, 1313 (9th Cir. 1987) (finding that a jailhouse informant was not a government

9    actor because there was no pre-existing agreement between the informant and the FBI and there

10   was no quid pro quo underlying the informant's relationship with the government).

11                                   ***Discussion***

12        Defendant points to several categories of evidence he believes shows that Carnival staff

13   acted as an "instrument or agent" of the government including (1) provisions of the Code of

14   Federal Regulations which require passenger vessel operators to report any serious incident

15   onboard a vessel and also require security officers, security plans, and security programs; (2) an

16   October 24, 2008 agreement between the major cruise lines and the government regarding the

17   procedures for reporting serious violations of U.S. laws onboard a cruise ship; (3) training

18   provided to cruise ship security personnel by the FBI, Customs and Border Protection ("CBP"),

19   U.S. Coast Guard ("USCG"), and Immigration and Customs Enforcement ("ICE"); (4) Carnival's

20   own "Corporate Security Standards"; and (5) Carnival's cooperation and coordination with the

21   FBI in the investigation and prosecution of this case.

22        *1. CFRs*

23        Defendant argues the following provisions of the Code of Federal Regulations ("CFRs")

24   required Carnival staff to engage in law enforcement activity:

25         –    46 C.F.R. §§ 4.03-2, 4.03-4, 4.05.1, and 4.05-10 (requiring passenger vessel
                operators to immediately file a report with the U.S. Coast Guard ("USCG") when
26              someone dies onboard the vessel);

27   _____

28   between Carnival and the FBI in determining whether Carnival was acting as an "instrument or
     agent" of the government.

1    –    46 C.F.R. § 4.23 (requiring passenger vessel operators to forward any evidence of
           criminality to the Attorney General);
2    –    33 C.F.R. §§ 120.200, 120.210, and 120.220 (requiring passenger vessel operators
           to implement a security program, to provide among other things for the safety and
3          security of persons and property onboard the vessel against unlawful acts; also
           requiring that the operator report unlawful activity onboard the vessel to the FBI)
4
     Defendant argues these regulations, collectively, required Carnival to investigate and report Mrs.
5
     McGill's death. Defendant argues this type of regulation is a strong factor showing Carnival staff
6
     acted on behalf of the government when it investigated Mrs. McGill's death.
7
          Courts have found the existence of federal regulations converts private actors into
8
     government agents for Fourth Amendment purposes only where the challenged search was
9
     required by, and conducted pursuant to, those regulations.  For example, it is well established that
10
     a private airline employee searching a passenger's carry-on luggage pursuant to federal regulations
11
     is acting on behalf of the state; thus, the Fourth Amendment applies to such searches.  United
12
     States v. Ross, 32 F.3d 1411, 1413 (9th Cir. 1994) (quoting United States v. Davis, 482 F.2d 893,
13
     897 (9th Cir. 1973))("[t]he government's involvement in promulgating the Federal Aviation
14
     Administration guidelines to combat hijacking is so pervasive 'as to bring any search conducted
15
     pursuant to that program within the reach of the Fourth Amendment'.").  However, because federal
16
     regulations do not require airline employees to search airfreight packages, an airline employee
17
     searching such packages is not acting on behalf of the government.  United States v. Gumerlock,
18
     590 F.2d 794, 799- 800 (9th Cir. 1979) (noting that unlike airline passengers and their carryon
19
     luggage, the FAA's regulations do not subject airfreight shipments to a mandatory security
20
     screening process).
21
          The federal regulations governing passenger vessel operators did not require Carnival to
22
     search defendant's cabin or obtain a statement from defendant.  The federal regulations only
23
     required Carnival to report very basic information regarding the incident to the FBI and USCG.
24
     The Coast Guard "Report of Marine Accident, Injury or Death" form, required by 46 C.F.R.
25
     § 4.05-10,  seeks information regarding the identity of the victim, when and where the incident
26
     occurred, and a description of the casualty.  Similarly, the FBI "Cruise Line Report of Alleged
27
     Serous Violations of U.S. Law Form," required by 33 C.F.R. § 120.220, seeks the vessel name,
28
     flag, operator, location at the time of the incident, type of incident, exact location of the incident,

date and time of the incident and date and time the incident was reported to the ship, extent of injuries, medical treatment provided, and a description of the alleged incident and any evidence collected.  Carnival staff could have completed these forms without conducting any search or obtaining any statements from defendant.  Cf <u>United States v. Stevens</u>, 601 F.2d 1075, 1078 (9th Cir. 1979) (bank investigators were acting in a purely private capacity, and not as agents of the government, when they promised defendant immunity; bank investigators did not have to interrogate defendant in order to secure enough information to comply with federal banking regulations and no regulation vested bank investigators with law enforcement authority).  There are no pervasive federal regulations which required Carnival staff to take any particular action to investigate Mrs. McGill's death.

### *2.  Agreement between Cruise Lines and the FBI*

Defendant argues an October 24, 2008 letter from the FBI to the Cruise Lines International Association ("CLIA"), documenting "procedures relating to the reporting of serious violations of United States laws committed aboard cruise ships, and FBI response to such violations," also establishes that Carnival was required to act as the government's investigatory agent. [Defendant's Pretrial Motions, filed September 14, 2009, Doc. 21, Exhibit D.]  The Court disagrees.

The October 24, 2008 letter (a) outlines the FBI's jurisdiction over crimes committed upon cruise ships, (b) instructs CLIA members to report serious violations of U.S. laws by telephone to the nearest FBI Field Office or Legat Office as soon as possible and follow up with a standard written report, and (c) indicates that the FBI Field Office or Legat will coordinate all aspects of the investigation.  The October 24, 2008 letter does not direct, authorize, request, or require cruise lines to undertake any independent investigation.

There is no evidence that the FBI directed or coordinated Carnival staff's initial entry into defendant's cabin, the search of defendant's backpack, or any initial questioning of defendant. Carnival staff discovered Mrs. McGill's body on board the *Elation* at approximately 8:20 p.m. PST.  [Declaration of Michael Panariello in support of government's opposition to motion to suppress ("Panariello Decl."), filed January 22, 2010, Doc. No. 58-2, ¶ 14.]  The *Elation*'s staff

1  captain notified Mr. Panariello, Carnival's staff investigator in the security services division in

2  Miami, Florida, about the potential homicide at approximately 8:30 p.m. PST.  [Id.]  Mr.

3  Panariello instructed  the staff captain "to protect, document, photograph and videotape the crime

4  scene," although the *Elation* crew was already doing those things.  [Id., ¶ 15.]  Mr. Panariello

5  contacted the FBI by phone at approximately 9:10 p.m. PST.  [Id., ¶ 16.]  FBI Agent John Ireland

6  did not ask, direct, request, or suggest that Carnival crew enter defendant's cabin, photograph the

7  cabin, videotape the cabin, speak to defendant, search defendant and his belongings, or segregate

8  defendant in the brig.  All of those tasks had been completed before Mr. Panariello contacted the

9  FBI.  [Id., ¶¶ 17 and 18.]  Therefore, the October 24, 2008 letter reflecting an agreement between

10  the cruise lines and the government in no way establishes Carnival staff acted as agents or

11  instrumentalities of the government.

12       *3.  Training provided to cruise ship security personnel by the FBI, CBP, USCG, and ICE*

13       Defendant has provided the Court with a number of materials which he contends

14  demonstrate a close collaborative relationship between Carnival and the federal government

15  sufficient to bring Carnival staff's actions under the purview of the Fourth and Fifth Amendments.

16  The materials defendant relies upon fall into two categories: (a) general training by federal agents

17  on issues of concern to cruise line security personnel, and (b) training by FBI agents on crime

18  scene preservation.[2]

19      *(a)  General training*

20       Each year, Carnival's senior security staff attends "Shipboard Security Training" at

21  Carnival's headquarters in Miami, Florida.  Defendant has produced copies of the agendas for the

22  2008 and 2009 training sessions.  The training sessions cover a variety of topics including alcohol

23  awareness, explosive detection, communications and listening skills, sexual harassment, anger

24  

25      [2]Defendant argues training by Carnival staff regarding crime scene sketching and
interviews and interrogations is also relevant to demonstrate Carnival staff were government actors
because some of the Carnival staff incorporated FBI and CBP methods and forms. In addition,

26  defendant points to the fact the Carnival employees who created the presentation on interviews and
interrogations were former law enforcement officers, and also incorporated materials provided by

27  the FBI academy.  The fact Carnival staff incorporated FBI and CBP methods and forms, or
incorporated their own law enforcement training, however, does not demonstrate that the FBI or

28  CBP actively encouraged Carnival security staff to detain and question crime suspects or search
for evidence of criminal activity.

1   control and conflict resolution, dealing with the elderly or mentally ill, and behavioral recognition

2   and considerations. [Defendant's Evidentiary Hearing Exhibits E and G.]  This training is

3   conducted by Carnival staff.

4       In addition to this general training by Carnival staff, the FBI, USCG, CBP, and ICE

5   conducts annual training on a wide variety of issues.  For example, the CBP training in 2008,

6   focused on how to spot drug smugglers and where to "check" to find illegal drugs.  The USCG's

7   2008 presentation on "Issues of Maritime Concern" included a discussion of USCG hierarchy and

8   requirements for ship security plans, ship security officers, crew identification and screening, and

9   movement in restricted areas.  The 2008 ICE presentation, titled "Global and Caribbean

10  Enforcement Initiative," included a discussion of the structure of the Department of Homeland

11  Security, and methods, trends, and law enforcement efforts relating to human trafficking,

12  smuggling activities, cyber crimes, financial crimes, and terrorism.

13      The 2009 training addressed similar issues. For example, the 2009 CBP training session,

14  titled "Persons of Interest/Current Issues and Concerns," covered issues such as advising CBP of

15  high risk passengers before entering port, searching crew members going ashore in the United

16  States (for contraband), and the need to notify CBP of any crew member who "absconds" from the

17  ship.  The USCG 2009 training, titled "MTSA/ Security Incidents and Breaches of Security,"

18  included topics such as reporting any "suspicious activity" especially the discovery of a weapon or

19  ammunition or persons asking "unusual questions."

20      Defendant argues that federal law enforcement's training of Carnival's chief security

21  officers shows a "close collaborative relationship between Carnival and the federal government."

22  However, none of the cases cited by defendant support a finding that this type of generalized

23  "close collaborative relationship" converts the individual Carnival security officers who detained

24  and questioned defendant, or who entered his cabin, into agents or instruments of the government.

25  None of the presentations by CBP, USCG, or ICE address what cruise line security officers should

26  do in response to a passenger's report that someone may have been killed by a fellow passenger.

27  Nothing in the presentations by CBP, USCG, or ICE assist defendant in demonstrating the

28  government knew of and acquiesced in the conduct of the individual Carnival security officers

09cr2856

1  involved in detaining defendant or entering his cabin.

2       *(b)  FBI training on Crime Scene Preservation*

3       In 2008, the FBI also gave a presentation titled "Crime Scene Preservation."  Special Agent

4  Scott Hahn spoke about how to secure a crime scene and preserve evidence, and Special Agent

5  David Nunez discussed the FBI's investigative jurisdiction and reporting requirements.  Special

6  Agent Herberg Hogberg co-authored the PowerPoint presentation which SA Hahn utilized in his

7  portion of the training.  Defendant has provided the Court with the PowerPoint presentation co-

8  authored by SA Hogberg and used by SA Hahn, and the videotaped presentation by SA Nunez.

9       Defendant points to several portions of SA Hahn and SA Nunez's presentations which he

10  argues show the FBI directed Carnival security staff to undertake law enforcement activity to

11  assist and benefit the government.  For example, slide 10 of the PowerPoint presented by SA Hahn

12  tells staff to make a log of anyone entering the area; slide 12 tells staff to avoid disturbing

13  evidence and to instead take photographs; slide 13 tells staff to take "extensive notes" regarding

14  who, what, when, where, and to sketch the crime scene; slides 17 through 21 provide tips for crime

15  scene photography, and suggests keeping a photo log (a sample of which the FBI provided); slides

16  22 through 30 deal with evidence collection, and ask that staff maintain an evidence log and chain

17  of custody log; slides 34-35 specifically address homicide investigations, instructing staff to secure

18  the stateroom, photograph the victim, relocate and separate parties to other rooms, attempt to

19  obtain forensic evidence from the suspect and victims, and secure the body in refrigeration.

20  Although SA Nunez did not directly talk about crime scene investigation in his portion of the

21  training, defendant points to SA Nunez's introductory remarks explaining "why we're here

22  working with you guys" and SA Nunez's remarks about taking statements from crime victims and

23  writing detailed reports.

24       The government has provided a declaration and testimony by both SA Nunez and SA

25  Hogberg to rebut defendant's argument that the FBI's training on crime scene investigation shows

26  government knowledge and direction that Carnival engage in law enforcement activity.  Both SA

27  Nunez and SA Hogberg, in their declarations and during their testimony, stressed that the FBI

28  presentation on crime scene preservation "do[es] not ask or command, directly or indirectly, the

1   cruise lines to conduct searches, to detain suspects, or to interrogate anyone when a crime is

2   committed aboard one of their ships."  [Declaration of David Nunez in Support of Government's

3   Opposition to Motion to Suppress ("Nunez Decl."), filed January 22, 2010, Doc. 58, ¶ 5;

4   Declaration of Herbert Hogberg in Support of Government's Opposition to Motion to Suppress

5   ("Hogberg Decl."), filed January 22, 2010, Doc. 58, ¶ 5.] .]  The FBI would prefer private parties

6   refrain from conducting crime scene searches or interrogating suspects.  [Nunez Decl., ¶ 6.]  "If

7   anything, the presentation indirectly advises cruise lines not to conduct searches" because "one

8   cannot both preserve and search a crime scene."  [Hogberg Decl., ¶ 6.]

9        Upon review, the Court is persuaded that the FBI, by providing training on crime scene

10   preservation, did not direct Carnival to search for and seize evidence implicating the Fourth

11   Amendment.  Nor did the FBI acquiesce in such conduct.  The FBI PowerPoint repeatedly states

12   the FBI's preference that cruise line personnel not enter a potential crime scene.  Furthermore, in

13   the event cruise ship personnel must enter the potential crime scene, the FBI PowerPoint instructs

14   personnel to make every attempt to "secure and 'freeze' the scene as closely to the condition in

15   which it was found."  [Defendant's Evidentiary Hearing Exhibit F, Slide 9.]  Cruise line security

16   personnel are instructed that "[t]he scene must be secured until all physical evidence has been

17   collected by law enforcement."  [Id., Slide 10]. Another slide reminds security personnel to avoid

18   collecting evidence:

19        IMPORTANT – CRUISE LINE PERSONNEL SHOULD ONLY COLLECT
          EVIDENCE IN SITUATIONS WHERE:
20            ● THE EVIDENCE CANNOT BE SECURED IN PLACE E.G. IF
              LOCATED IN A PUBLIC ACCESS AREA; OR
21            ● DUE TO ITS LOCATION, THE EVIDENCE IS AT RISK OF BEING
              DESTROYED OR LOST I.E. BY FIRE, FLOOD OR BY THE ACTIONS
22            OF A POTENTIAL SUSPECT

23   [Id., Slide 30.]  These instructions by the FBI, to secure and preserve a potential crime scene, in no

24   way direct Carnival to search for or seize evidence.  The fact the FBI provides Carnival with

25   additional guidelines to be observed, in the event a potential crime scene cannot be secured in

26   place, does not convert Carnival's purely private conduct into "government action" for Fourth

27   Amendment purposes.

28        Furthermore, there is nothing in the record demonstrating the FBI or any other law

1    enforcement agency directed Carnival security staff to attempt to elicit incriminating statements

2    from individuals suspected of criminal activity.  Defendant points to SA Nunez's statements

3    during his 2008 training, about taking statements from *crime victims*.  However, taking statements

4    from *crime victims* in no way implicates *defendant's* right to self-incrimination.

5            The Fourth Circuit's recent decision in <u>United States v. Day</u>, 591 F.3d 679 (4th Cir. 2010),

6    provides a good framework for analyzing defendants' arguments about the impact of government

7    training upon the private nature of Carnival's actions.  In <u>Day</u>, the Fourth Circuit considered

8    whether private armed security officers in Virginia acted as government agents during their

9    encounter with the defendant.  The private officers were on duty at an apartment complex when

10   they saw defendant retrieve a gun from a car during an argument at one of the apartments. The

11   security officers drew their weapons and ordered the defendant to freeze. Defendant put the gun

12   back on the floor of the car and raised his hands. After they restrained and patted-down the

13   defendant (without finding any contraband), one of the officers asked defendant if he had anything

14   illegal on him.  Defendant admitted he had a little marijuana.  The officers contacted their superior,

15   at the City Police Department, who took custody of defendant. Defendant argued that his statement

16   to the private security officers, and any contraband they recovered, should be suppressed because

17   the officers did not give him any <u>Miranda</u> warnings.  The court disagreed.

18           Private security guards in Virginia are highly regulated by law.  In particular, private

19   security guards are "vetted, trained, and continue to be subject to disciplinary action under the

20   aegis of the state's Criminal Justice Services Board."  591 F.3d at 684.  In addition, private armed

21   security officers must have a "valid registration" and satisfy "compulsory minimum training

22   standards established by the Board."  Finally, private armed security officers are empowered by

23   the Virginia Code with the power to arrest an individual for an offense occurring in the on-duty

24   officer's presence.  <u>Id</u>.  Nonetheless, in finding that the security guards were not agents or

25   instrumentalities of the state, so as to implicate the Fourth and Fifth Amendments, the court

26   stressed that even where the government regulates and provides guidance regarding the

27   qualifications of private armed security guards, there is no governmental action absent state

28   involvement in a particular arrest or search, or absent government direction of the private officer's

1   day-to-day activities.  Day, 591 F.3d at 686.

2          Here, notwithstanding any training the FBI provided to Carnival staff about how to secure

3   and preserve a potential crime scene, it is undisputed that the FBI does not direct the day-to-day

4   activities of Carnival; nor did the FBI directly or indirectly ask Carnival security staff to search or

5   seize evidence. Carnival staff initially entered defendant's cabin to ascertain Mrs. McGill's

6   welfare, after a fellow passenger told Carnival staff that defendant said he killed his wife.

7   [Declaration of Michael Panariello in Support of Government's Opposition to Motion to Suppress,

8   filed January 22, 2010, Doc. 58, ¶ 19.]  Carnival segregated defendant from the other passengers,

9   asked him what happened, and searched his backpack all out of a concern for the safety of the

10  Elation's guests and crew, and not at the direction of the FBI.  [Id., ¶¶ 20-22.]  The FBI did not

11  instruct or request Mr. Panariello or Carnival to conduct any investigation.  [Declaration of John

12  Ireland in support of government's opposition to motion to suppress, filed January 22, 2010, Doc.

13  No. 58-3, ¶ 6.]  Under these circumstances, the Court finds Carnival staff did not act as

14  instruments or agents of the government.

15          *4.  Carnival's Security Standards*

16          Defendant also points to Carnival's "Corporate Security Standards" as evidence that

17  Carnival acted jointly with the government, as the government's agent, and at its behest.

18  [Defendant's Pretrial Motions, filed September 14, 2009, Doc. 21, Exhibit J.]  This 3-page

19  document states "[s]hip personnel must protect the integrity of incident scenes and any potential

20  evidence for investigation by law enforcement authorities."  It also notes "[s]hip personnel may be

21  required to conduct investigative steps when certain offenses are alleged, when law enforcement

22  authorities request investigative assistance, or when exigent circumstances exist."  The document

23  then provides guidelines to Carnival security staff, including to protect evidence for law

24  enforcement authorities, follow the instructions of law enforcement authorities, "document

25  pertinent facts to provide responding law enforcement authorities with necessary information,"

26  seek direction from law enforcement before doing follow-up investigation, and "[m]aintain all

27  evidence in a secure location until it can be released to law enforcement."

28          Carnival's Corporate Security Standards are purely internal.  There is no evidence to

suggest the government participated in Carnival's drafting or implementation of the Standards. Defendant does not cite any case law which permits the Court to find Carnival's directions to its security staff, to protect and preserve any potential crime scene, show government action.

### 5. Additional Cooperation between Carnival and the Government

Finally, defendant argues Carnival has been extremely cooperative with the government's investigation of Mrs. McGill's death, freely handing over evidence and providing access to the ship and crew. Defendant argues Carnival's "hand-in-glove" cooperation with the government is further evidence that Carnival staff acted on behalf, and for the benefit, of the government. Defendant has not cited any case law, however, for the proposition that a private party's cooperation with the government's investigation of a crime converts that private party into a government actor for Fourth or Fifth Amendment purposes.

### Conclusion

For the reasons set forth herein, the Court DENIES defendant's motion to suppress evidence and statements obtained by Carnival staff. This order is without prejudice to defendant filing a further motion to suppress particular pieces of evidence or certain statements of defendant based on the FBI's involvement.

**IT IS SO ORDERED**.

**DATED: March 16, 2010**

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**

09cr2856